USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 16, 2012

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
UNITED STATES OF AMERICA,
                    Plaintiff,

     - against -

LOUIS TOMASETTA AND
EUGENE HOVANEC,

                    Defendants.
-------------------------------------------------------------X

10 Cr. 1205 (PAC)

ORDER & OPINION

HONORABLE PAUL A. CROTTY, United States District Judge:

      Defendants Louis Tomasetta and Eugene Hovanec ("Defendants") are charged with multiple counts of securities fraud, relating to their employment at Vitesse Semiconductor Corporation ("Vitesse"). Familiarity with the Court's prior orders is assumed (see Dkt. No. 31, 52, 67, 86, 98), though the facts relevant to the current discovery dispute are detailed below.

      On the eve of trial, 43 boxes of documents, which contained some materials that neither the Government, nor the Defendants had seen before, were produced by Munger Tolles & Olsen LLP ("Munger"), a law firm representing the Special Committee of Vitesse's Board of Directors (the "Committee"). As a result, the Court adjourned the trial and conducted an inquiry into the discovery issued raised by the late document production.

      The Defendants, arguing that a continuance was insufficient to account for the Government's purported Rule 16 and Jencks Act violations, now move for remedies including: a fact inquiry, reimbursement of costs, a change in venue, evidence and witness preclusion, reversal of the Court's ruling on a deferred opening, and dismissal.[1]

      Defendants requests range far afield from any wrong which may have occurred; and they are DENIED.

---

[1] The Defendants simultaneously moved in limine to preclude the certain security analyst testimony. Defendants' motion in limine will be addressed at the final pre-trial conference on March 19, 2012, and not in this order.

## FACTS

On April 11, 2006, the Committee hired Munger to conduct an investigation into Vitesse's stock options practices. (Feb. 8, 2012, Barth Declaration ("Barth Decl.") ¶ 4.) On April 21, 2006, Munger's investigation expanded to include other accounting issues or irregularities, such as "issued related to the Company's practices with respect to customer credits and related accounting treatment, and the application of payments received to the proper accounts receivable." (Vitesse's SEC Submission, dated Apr. 30, 2009, at 3.) (Barth Decl. ¶ 7.) Munger thereafter collected numerous hard copy and electronic documents from Vitesse, including documents from Tomasetta, Hovanec, and Yatin Mody's ("Mody")[2] offices. (Id. ¶¶ 9-19.)[3] Personal items and clearly irrelevant materials—such as Vitesse merchandise—from Tomasetta, Hovanec, and Mody's office were removed from the document collection materials. (Id. ¶¶ 12, 22.) The hardcopy documents were then scanned and loaded onto a database that also included electronic documents collected from Vitesse. (Id. ¶ 21.) Among the documents collected, scanned, and loaded onto an electronic database were handwritten notebooks that Mody maintained. (Id. ¶ 26.) Munger then conducted a multi-tiered review of the database for relevance, responsiveness, and privilege. (Id. ¶¶ 22-24.) In October or November 2006, O'Melveny & Myers LLP ("O'Melveny"), Vitesse's outside counsel, took over the review. (Id. ¶ 28.)

The United States Attorney's Office for the Southern District of New York (the "Government") and the Securities and Exchange Commission ("SEC") also began investigating Vitesse's financial practices. The Government served three grand jury subpoenas on Vitesse, dated May 17, 2006, June 18, 2006, and September 15, 2006. (Jan. 30, 2012 Government Report ("Gov't Report") at 4.) On or about May 31, 2006, Munger and O'Melveny began producing documents to the Government on behalf of Vitesse, in response to the Government's first subpoena. (Gov't Report at 5.)

---

[2] Mody, a former Vitesse employee, is now cooperating with the Government and is expected to be called as a witness at trial. His handwritten notebooks are among the new material produced on the eve of trial.

[3] Tomasetta, Hovanec, and Mody had been placed on administrative leave by the Board of Directors on April 17, 2006. (Id. ¶ 5.)

Four plus years later, on December 7, 2010, the Government indicted Defendants Tomasetta and Hovanec.[4] In January 2011, the Government began producing to Defendants the discovery material that it received from Vitesse. (Gov't Report 6.) On April 11, 2011, the Government represented to the Court that it had substantially completed its production under Rule 16 of all the necessary material in its possession. (Apr. 11, 2011 Tr. 2.) Defendants maintained that due to the voluminous nature of the discovery, they would need months to review the materials and prepare for trial. (Apr. 11, 2011 Tr. 4-5.) The Court accommodated their request and set a date in January 2012 for trial. (See id. at 18.)

The event which led to the current dispute occurred on October 24, 2011 when the Government interviewed one of its key witnesses, Yatin Mody, who told the Government's attorneys, present with other law enforcement personnel in attendance, that he maintained detailed notes in a composition notebook. (Gov't Report 1-2.) The Assistants were not aware of the notebooks, having not previously heard of their existence, and called Munger to inquire about them. (Gov't Report 2.) The Munger lawyer told the Government that if the notebooks existed, they would have been produced already. (Gov't Report 2; Barth Decl. ¶ 34.) This representation was not correct. (Barth Decl. ¶ 29.) On November 9, 2011, the Government issued a trial subpoena, not to Munger but to O'Melveny, for, inter alia, Mody's notebooks. (See Gov't Report Ex. A.) O'Melveny disputes whether it received the subpoena, and, in any event, did not respond to it. (See Bookin Decl. ¶ 5.)[5] The Government failed to follow-up with either Munger or O'Melveny concerning its search for Mody's notebooks or its November 9 subpoena until late December 2011.

In late December 2011 and early January 2012, the Government issued a number of trial subpoenas to Munger and O'Melveny for additional original materials to use at trial, which was scheduled to begin on January 23, 2012. (Gov't Report 3.) The Government also asked Munger to ship

---

[4] Mody pled guilty to three counts of securities fraud on December 3, 2010. On December 10, 2010, the SEC also filed a complaint against the Defendants. (See 10 Civ. 9239 Dkt. No. 1.)

[5] The Government has submitted Federal Express records to confirm that the subpoena was delivered to O'Melveny's mail room on November 10, 2011. (Gov't Report Ex. A.)

to the Government any boxes of material taken from Mody's office, so the Government could look for the notebooks. (Gov't Report 3.) In searching for originals responsive to the Government's subpoenas, Munger found boxes of original materials from Mody and Hovanec's offices, which included Mody's notebooks. (Barth Decl. ¶¶ 36-37.) On January 15, 2012, Munger notified the Government of this discovery. (Barth Decl. ¶ 38.) At the same time, Munger explained that it could not quickly identify the documents responsive to the Government's subpoenas because the original documents did not have bates numbers. (Barth Decl. ¶ 38.) Munger and the Government then agreed that Munger would send 21 boxes containing the potentially responsive original materials—including Mody's notebooks—to the Government. (Barth Decl. ¶ 38.) On January 18, 2012, the Government notified the Defendants that it was receiving 21 boxes of original versions of previously-produced documents, and offered to make these materials available for the Defendants' review. (Gov't Report 3.)

On January 20, 2012, the Friday before trial, Defendants' counsel began reviewing these originals and discovered what they believed to be new materials that they had not seen before. (Jan. 20, 2012 Tr. 2.) The Defendants immediately notified the Court of this discovery, and the Court addressed the issue on a conference call with the parties that afternoon. The Government stated that it could not confirm or deny whether the materials in the 21 boxes had previously been produced because the originals were not bates numbered and thus could not easily be matched to the Government's prior productions. (Jan. 20, 2012 Tr. 5.) The Government nonetheless admitted that Mody's notebooks looked like new material. (Id. at 10.) The Court asked the Defendants if they wanted an adjournment to review the materials in these 21 boxes. (Id. at 8-9.) The Defendants asked to defer their answer until Monday January 23, 2012, giving them the weekend to review (or begin to review) the materials in the boxes. (Id. at 9.) The Court then directed the Government to check with Munger to confirm that Munger did not have any other originals that had not been previously produced. (Id. at 11-12.)

In checking with Munger, the Government learned that Munger had 22 additional boxes of original materials in its possession, and that it could not confirm whether these materials had been

4

produced before. Munger then shipped these 22 boxes to the Government. (Gov't Report 3.) The Government notified the Defendants and the Court of this development and requested that the trial be adjourned. (See Gov't Letter dated Jan. 21, 2012).

On January 23, 2012, the anticipated first day of trial, the Court held a hearing to address these discovery issues and subsequently to adjourn the trial. (See Jan. 23, 2012 Tr.) The Court directed the Government to submit a report explaining: (a) the events leading up to the receipt of 43 boxes of original material on the eve of trial; (b) how it was that these new materials had not previously come to light; (c) the history and scope of Vitesse's document collection and production to the Government and the SEC; (d) the Government's discovery productions to the Defendants; and (e) whether the complete universe of documents had now been defined. (See Jan. 23, 2012 Tr. 42-43.) Following the Government's report, the Court held two additional hearings—on February 3, and 15, 2012—and received numerous written submissions from the Government, the Defendants, Munger, and O'Melveny. Among other things, the Court's inquiry revealed: that most of the materials in the 43 boxes had been previously produced (Donovan Decl. ¶ 9); Mody's notebooks should have been produced to the Government in 2006, but were not, for reasons that cannot be determined (Barth Decl. ¶ 29); and Munger does not have any more original documents in its possession (Barth Decl. ¶ 42). The inquiry confirmed that the Government had produced to the Defendants all the materials in its physical possession in a timely manner.

Additionally, as a result of the investigation, Vitesse complied with Defendants' requests to have other materials made available for their review, including: all the hard copy documents that had been collected from Vitesse and scanned; 121 boxes generally consisting of materials collected and scanned or materials from the defendants and Mody's offices that had been deemed irrelevant; and direct access to the electronic database. (See Feb. 15, 2012 Tr. 5-7)[6] Notably absent from this investigation, however, was any claim (or any evidence to show) that Mody's notebooks, or any of the new materials,

---

[6] The Defendants did not at any point during or after the investigation, seek a trial subpoena to obtain any other documents.

contained anything prejudicial to Defendants. The Court, satisfied with these results, provided the Defendants with additional time to review the materials and set a new trial date for March 21, 2012. (Feb. 15, 2012 Tr. 50.)

Defendants now claim that the Government's late production of these materials warrants: a fact inquiry, reimbursement of attorneys' fees and costs, a change in venue, evidence and witness preclusion, reversal of the Court's ruling on a deferred opening, and dismissal. The Defendants do not argue that the new materials contained anything prejudicial, but rather seek the proposed remedies based on the tardiness of the production.

## DISCUSSION

Defendants argue that the Government breached its Rule 16 obligations by failing to produce Mody's notebooks and other new materials until the eve of trial; and breached its Jencks Act obligation by failing to memorialize and disclose Mody's statement about his note-taking practices. There has been no breach of either Rule 16 or the Jencks Act.

A. The Government's Rule 16 Obligations

Rule 16 of the Federal Rules of Criminal Procedure imposes discovery requirements on the Government, including that the Government "must permit the defendant to inspect and to copy" materials "if the item is within the government's possession, custody, or control," and the item: (i) is "material to preparing the defense"; (ii) is one that the Government intends to use at trial; or (iii) "was obtained from or belongs to the defendant." Fed.R.Crim.P. 16(a)(1)(E). Under Rule 16(c), "[a] party who discovers additional evidence or material before or during trial must promptly disclose its existence to the other party or the court if . . . subject to discovery or inspection under this rule . . . ."

Mody's notebooks (and possibly other newly produced materials) are clearly relevant and material to preparing a defense. Thus, the Government had an obligation to produce these materials once they were within its "possession, custody, or control." Rule 16(a)(1)(E). The Defendants argue that the Government, by negotiating the scope of the responsive information to be collected from Vitesse

6

and produced to the Government, was in control of these materials, and that Vitesse and Munger were acting as agents for the Government.

Documents in the hands of cooperating third parties are not attributable to the Government. See United States v. Josleyn, 206 F.3d 144, 154 (1st Cir. 2000) (rejecting attribution theory that cooperating company was part of "prosecution team," and holding that Government is not accountable for information known by cooperating private parties). There is no "'affirmative duty upon the government to take action to discover information which it does not possess.'" United States v. Tierney, 947 F.2d 854, 863-64 (8th Cir.1991) (rejecting argument that the Government breach its discovery obligation by failing to spend more time reviewing documents in a repository, and thus, failing to find a witness's diary) (quoting United States v. Beaver, 524 F.2d 963, 966 (5th Cir.1975)). Likewise, the Government is not obliged "to obtain evidence from third parties," including cooperators. See United States v. Buske, 2011 WL 2912707, at *7 -8 (E.D.Wis. 2011) (rejecting argument that "[b]ecause of the coordinated effort between [the third-party company] and the government, . . . that the government [must] be ordered to seek out certain discovery materials from [the company]."). Moreover, the fact that a third-party corporation is cooperating with the Government's investigation—as many do—does not turn it into an "agent" of the Government. See Josleyn, 206 F.3d at 154 (holding that defendant's employer, while a cooperating private party, "was not part of the prosecution team"). Cooperating parties have their own sets of interests—namely, avoiding prosecution—that "are often far from identical to-or even congruent with-the government's interest[ ]" in justice being served. Id.

If the Government has a written agreement with the third party giving it the legal right to obtain documents upon demand, however, the Government may be in "control" of such materials, even if in the possession of third parties. See United States v. Stein, 488 F.Supp.2d 350, 363 (S.D.N.Y. 2007) (finding Government had control over documents in the hands of defendants' former employer where the employer signed a deferred prosecution agreement with the Government requiring it to, inter alia, promptly produce all documents requested by the Government). Additionally, in some cases, courts

7

have directed the Government to use its "best efforts" to try to obtain specifically requested information from third party cooperators. See e.g., United States v. Kilroy, 523 F.Supp. 206, 215 (E.D.Wis.1981).

But that is not the case here; the Government was never in "control" of the materials in Munger's physical possession. Unlike Stein, there is no deferred prosecution agreement here, or any agreement of its kind, giving the Government the legal right to obtain materials from Vitesse (or Munger) on demand. To the contrary, when the Government sought information from Vitesse, it had to subpoena the documents. The fact that Vitesse complied with the Government's subpoenas and negotiated details regarding document production did not turn Vitesse into an agent of the Government. See Josleyn, 206 F.3d at 154. Tellingly, the Government had to issue multiple subpoenas and wait over two months to receive original materials from Munger and O'Melveny, which belies any notion that the Government was in control of such documents. Since the materials at issue here were outside of the Government's control, it had no Rule 16 obligation to discover or obtain these materials.

Furthermore, there is no suggestion that the Government was even aware of the possible existence of these notebooks before October, 2011. Rule 16 "imposes no disclosure obligation [on the Government] when the evidence is in the hands of a person who is not a government agent and the government has no reason to suspect that the evidence exists." United States v. Matthews, 20 F.3d 538, 550 (2d Cir.1994). Accordingly, the Government did not breach its Rule 16(a) discovery obligation.

The Government is required to promptly disclose the existence of additional discoverable material. Fed.R.Crim.P. 16(c). The Defendants argue that the Government should have notified Defendants of the possible existence of these notebooks in October 2011, promptly after learning about them, rather than in mid-January 2012. The Government's conduct in this regard was certainly tardy. It should have followed up more quickly with Munger and O'Melveny to determine whether the notebooks existed—rather than let more than six weeks pass between its discussion with Munger and subpoena to O'Melveny (on November 9, 2011), and its follow-up email to Munger (on December 20, 2011). Nor should the Government have kept the information to itself. Had the Government been more open about

the possible existence of these notebooks and its attempts to locate them, they would have been produced sooner. Certainly the Court could have helped the Government enforce the trial subpoenas.

Nonetheless, while the Government was tardy in its efforts to determine the existence and thereafter the production of Mody's notebooks, the fact is that as soon as the Government had these notebooks (and other materials) in its possession, it produced them to the Defendants. Having promptly disclosed and produced the materials once in its possession, the Government did not breach its Rule 16(c) obligation.

### B. The Government's Jencks Act Obligations

The Jencks Act requires the production of statements by a witness that "relates to the subject matter as to which the witness has testified." 18 U.S.C. §§ 3500(b), (e). The Government, however, "is not required to make notes of a witness's statements." United States v. Rodriguez, 496 F.3d 221, 225 (2d Cir. 2007); see also United States v. Houlihan, 92 F.3d 1271, 1288 (1st Cir.1996) ("The Jencks Act does not impose an obligation on government agents to record witness interviews or to take notes during such interviews."). Where "no such memorialization has been created in the first place" the Government does not have a Jencks Act obligation.

The Government did not take notes of the October 24, 2011 interview with Mody concerning his practice of taking notes in a composition notebook. While the Defendants argue that the Government should have taken notes on this subject, the Jencks Act does not require it. Accordingly, the Government has not violated its Jencks Act obligation.

Defendants do not claim that the notebooks contain Brady material, which the Government would have been obligated to disclose. See Rodriguez, 496 F.3d at 225-26. Nor do the Defendants expressly argue that the Government breached its Giglio obligation, though they mention, in a footnote, that "it is hard to imagine" how Mody's contemporaneous writings would not provide "ample material for impeachment." (Def. Reply 2 n.1.) Even if the Defendants were to make such an argument, they could not show that their rights have been violated because: (a) the Government did not suppress these

9

materials; (b) Defendants were given ample time—approximately two months—to review these materials; and (c) Defendants will have an opportunity to cross-examine Mody on the notebooks at trial. See United States v. Hamilton, 373 Fed. App'x 95, 97-98 (2d Cir. 2010) (holding that Government's mid-trial disclosure of documents did not violate defendant's Brady/Giglio rights when the materials "were not suppressed, since they were provided during the trial"; the Court allowed defense counsel a night to review the documents, which was "sufficient time to examine them"; and "all witnesses to whom the documents were relevant were cross-examined on their contents.").

    C. <u>Defendant's Remedies</u>

Having found no Rule 16 or Jencks Act violation, the Court need not address Defendants' proposed remedies, all of which are denied.

While the Defendants claim that they have not had sufficient time to run searches on the electronic databases and/or review the search results, they have had ample time to review: the Mody notebooks; 43 boxes of original materials that Munger had collected (most of which had previously been previously); and 121 boxes of originals Vitesse made available (many of which contain irrelevant materials like Vitesse merchandise). Despite having had approximately two months to review these materials, Defendants have not shown and indeed do not claim that the Mody notebooks, or other materials, contained anything prejudicial.[7]

Accordingly, while it is certainly unfortunate that new materials came to light on the eve of trial, the Court's two month adjournment of trial was a sufficient remedy for the late production.

---

[7] The Defendants do not seek, and the Court would not grant, an adjournment of the March 21, 2012 trial date.

## CONCLUSION

Defendants' motion for remedies to account for the Government's purported discovery violations is DENIED in its entirety. The Clerk of the Court is directed to terminate this motion (Dkt. No. 122).

Dated: New York, New York
       March 16, 2012

SO ORDERED

_____
PAUL A. CROTTY
United States District Judge